# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COLLEEN STRATTON, | : |
| | : |
| **Plaintiff,** | : |
| | : |
| v. | : **Case No.:** 2:21-cv-1517 |
| | : |
| PNC FINANCIAL SERVICES GROUP INC., | : |
| | : |
| | : **COMPLAINT IN CIVIL ACTION** |
| **Defendant.** | : |
| | : |

Filed on Behalf of Plaintiff:
Colleen Stratton

Counsel of Record for this Party:
**J.P. WARD & ASSOCIATES, LLC**

Joshua P. Ward
Pa. I.D. No. 320347

J.P. Ward & Associates, LLC
The Rubicon Building
201 South Highland Avenue
Suite 201
Pittsburgh, PA 15206

Telephone:    (412) 545-3015
Fax No.:        (412) 540-3399
E-mail:         jward@jpward.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **COLLEEN STRATTON,** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| v. : | **Case No.:** |
| : | |
| **PNC FINANCIAL SERVICES GROUP, INC.,** : | |
| : | |
| **Defendant.** : | |
| : | |

**COMPLAINT IN CIVIL ACTION**

AND NOW, comes Plaintiff, Colleen Stratton, by and through the undersigned counsel, J.P. Ward & Associates, LLC and, specifically, Joshua P. Ward, Esquire, who files the within Complaint in Civil Action against Defendant, PNC Financial Services Group, Inc., of which the following is a statement:

**PARTIES**

1. Plaintiff, Colleen Stratton (hereinafter "Plaintiff"), is an adult individual who currently resides at 509 Knoll Street, Pittsburgh, Pennsylvania 15212.

2. Defendant, PNC Financial Services Group, Inc., (hereinafter "Defendant"), is a corporation with its principal place of business located at 300 Fifth Avenue, Pittsburgh, Pennsylvania 15222.

1

**JURISDICTION AND VENUE**

3. Jurisdiction is proper as Plaintiff brings this lawsuit under the Americans with Disabilities Act (hereinafter, the "ADA"), 42 U.S.C. § 12101, *et seq*., the Pennsylvania Human Relations Act ("PHRA") 43 Pa. Cons. Stat. § 951 *et seq*., and the Family Medical Leave Act ("FMLA") 29 U.S.C. § 2601 *et seq.*

4. Venue is proper pursuant to Pa.R.C.P. 2179(a)(2) because Defendant regularly conducts business in Allegheny County, Pennsylvania, and because Defendant is subject to general jurisdiction of Allegheny County, Pennsylvania.

5. Plaintiff filed a timely charge with the Equal Employment Opportunity Commission ("EEOC") regarding her allegations on or about December 29, 2020, under charge number 533-2021-00544.

6. Plaintiff was issued a Notice of Suit Rights from the EEOC on July 26, 2021. The Complaint is now timely filed.

**PROCEDURAL HISTORY AND FACTUAL ALLEGATIONS**

7. On or about November of 2017, Plaintiff initiated employment with PNC as a Loan Processor.

8. Plaintiff's job responsibilities included reviewing initial loan approval, collecting all required documentation or the loan package, and ensuring approval falls within established lending guidelines.

9. At all times relevant to employment with Defendant, Plaintiff suffered from Generalized Anxiety Disorder ("GAD"), a mental health condition that causes Plaintiff to experience a rapid increase in rate, shortness of breath, mental anguish, and emotional distress.

10. Plaintiff further suffers from sciatica, a physical disability that causes Plaintiff to experience numbness and pain in her legs, making it difficult for Plaintiff to sit for extended periods of time.

11. Defendant was made aware of Plaintiff's GAD in July 2019 and her sciatica in February of 2018.

12. Plaintiff's GAD was heavily exacerbated when she was overwhelmed, yelled at, and experienced immense pressure placed on her by her employer. In her role as a Loan Processor, the constant change in rules and guidelines regularly worsened her condition.

13. Due to her GAD, Plaintiff invoked her right to FMLA which allowed three (3) days a month for migraines, a fifteen (15) minute break each day for anxiety and one (1) day to use when a panic attack arose.

14. These accommodations began on or about February of 2020.

15. On or about January 2020, Plaintiff was granted a sit/stand desk to use at work due to her sciatica.

16. Plaintiff's manager was an individual named Haley Eckert, ("Ms. Eckert").

17. Throughout Plaintiff's employment, Ms. Eckert constantly bullied Plaintiff and demeaned her due to her disabilities.

18. Ms. Eckert constantly questioned Plaintiff when she utilized the time pursuant to her disability. Plaintiff was not obligated to explain her use of FMLA time.

19. On or about December of 2019 and multiple times afterward, Plaintiff called the Employee Relations Information Center, a resource for employees to reach out to Human Resources about various issues, to report Ms. Eckert's behavior, but nothing ever resulted from these complaints.

20. On or about February 2020, Plaintiff was given the opportunity to interview for positions internally and informed Ms. Eckert that she would need transportation time for the interviews. Ms. Eckert was told it was company time and pursuant to policy, Plaintiff was not required to use paid time off. Plaintiff was approved to attend the interview and allocated time out of her work schedule to do so.

21. For reasons outside her control, Plaintiff's interview took more time than she was allocated. Upon returning to her office, Plaintiff was immediately chastised by Ms. Eckert in front of coworkers.

22. Upon information and belief, similarly situated coworkers were not publicly shamed and chastised by Ms. Eckert.

23. Furthermore, Ms. Eckert regularly used the weekly pipeline reviews to berate Plaintiff.

24. Plaintiff's performance reviews indicated satisfactory workplace performance.

25. As part of her employment, Plaintiff was entitled to five (5) occasional absence days per year to use as needed.

26. On or about June of 2020, Plaintiff consulted her physician regarding her worsening GAD symptoms which now included nausea and insomnia.

27. Plaintiff explained to her doctor that these symptoms were directly related to the increase of stress in her work environment and noted all increases and changes in her sleep pattern and stress levels.

28. Plaintiff attempted to explore treatment that would not involve medication, but the COVID-19 crisis made it difficult to schedule an appointment with a psychologist. Plaintiff's doctor strongly encouraged her to start medication due to her worsening symptoms.

29. On or about July 2020, Plaintiff requested to utilize FMLA time, but Ms. Eckert told Plaintiff her FMLA ran out June 1, 2020.

30. Plaintiff consulted her physician, who has a record of Plaintiff's FMLA time, and discovered this was not the case. Due to the miscommunication, Plaintiff had to use her occasional absence time and was never reissued that time.

31. Throughout the duration of Plaintiff's employment, Defendant monitored and recorded calls and interactions with clients. Plaintiff consistently scored highly in her interactions and her performance reviews reflected the same.

32. After a performance review was issued, Ms. Eckert did not praise Plaintiff in team meetings regarding her high score, despite regularly recognizing other processors that Plaintiff consistently outscored.

33. Ms. Eckert constantly downplayed Plaintiff's achievements and emphasized the negative components of Plaintiff's work. This occurred in the team meetings in front of Plaintiff's coworkers.

34. On or about March 2020, due to the COVID-19 crisis, Plaintiff was instructed to bring home her laptop and all materials needed to work remotely for two (2) weeks.

35. As Plaintiff relied on public transportation, Plaintiff was unable to take her sit/stand desk home to her remote workstation.

36. On or about March 2020, Plaintiff verbally requested to Ms. Eckert, and directly to her Human Resources Specialist, that she be permitted to work in the office part-time or have her sit/stand desk transported to her, because she had difficulty working in a seated position, given her sciatica.

37. This request was denied by Human Resources because Plaintiff had more than one (1) family member at home. Plaintiff was told that the presence of family members "increased" the possibility of the virus spreading. Additionally, Plaintiff was informed no one was permitted to be in the office at any time during the first weeks of quarantine, so her desk could not be transported to her.

38. At no point in the future were accommodations made such that Plaintiff could receive a standing desk at home and thus Plaintiff was denied reasonable accommodations pursuant to her disability.

39. During the period of remote work, Ms. Eckert bullied Plaintiff because of background noise in her home such as her bird chirping, noise from her children doing online classes and her husband in the background. These sounds were minor in nature and never disrupted Plaintiff's work or her interactions with clients.

40. Upon information and belief, Ms. Eckert did not bully Plaintiff's coworkers concerning insignificant background sounds. Ms. Eckert's remote workstation regularly exhibited disruptive background noises culminating in Ms. Eckert's microphone being muted during meetings, but Ms. Eckert never was chastised for it.

41. On or about April 2020, Plaintiff again requested she be permitted to work in the office part-time, because the office is a more stable environment, there are other loan processors in the office she could readily ask questions when needed, and her sit/stand desk was present at the office.

42. Plaintiff iterated this rationale to Ms. Eckert and was flatly denied any ability to work in the office because she "was not an essential worker." However, another loan processor from Plaintiff's team was able to work part-time in office.

43. Therefore, once again, Plaintiff was denied reasonable accommodations.

44. On or about April 24, 2020 Plaintiff was placed on probation following a confrontation with Ms. Eckert. Plaintiff was informed if her performance did not change, she could be terminated in 90 days.

45. The COVID-19 crisis drove the mortgage industry into a peak causing the number of loans Plaintiff's department processed to rapidly increase.

46. On or about April 2020, Plaintiff received an email from Michelle Marelli ("Ms. Marelli"), supervisor to Ms. Eckert, which stated that everyone was mandated to work 5 hours of overtime most weeks to cover the influx of loans.

47. On or about July 29, 2020, Plaintiff was terminated from her position as a Loan Processor. Plaintiff was told by Ms. Marelli, "you are not cut out for this role" and "this did not work out."

## COUNT I
## DISCRIMINATION IN VIOLATION
## OF THE ADA AND THE PHRA

48. Plaintiff incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

49. The inquiry into whether a person is disabled under the ADA is made on a case-by case analysis. *EEOC v. Grane Healthcare Co.,* 2 F. Supp. 3d 667, 694 (W.D. Pa. 2014); *Chedwick v. UPMC,* 2011 U.S. LEXIS 43239 *35 (W.D. Pa. 2011). To establish a prima facie case of discrimination under the ADA, Plaintiff must show: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of his job, with or without reasonable accommodations by the employer; and (3) he suffered an otherwise adverse employment decision as a result of discrimination. *See McGarvey v. Te Connectivity, Ltd.,* 2018

U.S. Dist. LEXIS 124788 *15 (M.D. Pa. 2018); *Northern v. Susquehanna Univ.,* 2018 U.S. Dist. LEXIS 214349 *28 (M.D. Pa. 2018).

50. The PHRA is modeled similarly to the ADA and shares similar burdens. The analytical framework used to evaluate a disability discrimination claim under the PHRA is effectively indistinguishable from that under the ADA, thus allowing courts to dispose of both ADA and PHRA claims on the same grounds. *Bialko v. Quaker Oats Co.*, 434 F. App'x. 139, 142 n.5 (3rd Cir. 2011) (citing *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002) (noting that the PHRA, in all "relevant respects," was "basically the same as the ADA" and was interpreted "in accord" with the ADA and related case law, thus meaning that "disposition of [plaintiff's] ADA claim applie[d] with equal force to his PHRA claim."

51. Under the ADA, an individual has a disability if he: (1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. *Thomas v. Trs. Of the Univ. of Pa.,* 2020 U.S. Dist. LEXIS 11056 *9 (E.D. Pa. 2020) (quoting *Lackey v. Heart of Lancaster Reg'l Med. Ctr.,* 704 F. App'x 41, 48 (3d Cir. 2017)).

52. In 2008, the ADA was amended to change its definition of disability, with the amendment effective as of January 1, 2009. *See McDonald v. PA. State Police*, 532 F.App'x 176 n.1 (3d Cir. 2013).

53. Under the ADAAA, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Berkowitz v. Oppenheimer Precision Prods.,* 2014 U.S. Dist. LEXIS 152533 at *8-9 (E.D. Pa. Oct. 28, 2014).

54. As set forth hereinabove, Plaintiff is disabled within the meaning of the ADA.

55. At all times relevant to employment with Defendant, Plaintiff suffered Generalized Anxiety Disorder, a mental health condition that causes Plaintiff to experience a rapid increase in rate, shortness of breath, mental anguish, and emotional distress.

56. Plaintiff further suffers from sciatica, a physical disability that causes Plaintiff to experience numbness and pain in her legs, making it difficult for Plaintiff to sit for extended periods of time.

57. Plaintiff is a highly qualified individual who is competent to successfully complete the necessary functions of her job.

58. This is evidenced by Plaintiff's workplace performance as a Loan Processor.

59. There is no evidence to suggest Plaintiff lacked any qualifications necessary to perform the functions of her job.

60. Plaintiff was regularly bullied and demeaned by Ms. Eckert because of Plaintiff's disabilities as described hereinabove.

61. Ms. Eckert did not treat similarly situated employees in the same fashion and specifically targeted Plaintiff because of Plaintiff's disabilities.

62. On or about July 29, 2020 was terminated and told by Ms. Marelli, "you are not cut out for this role" and "this did not work out."

63. This is in direct reference to Plaintiff's disability and Plaintiff's need for accommodations.

64. Plaintiff subsequently suffered an adverse employment decision in the form of regular mistreatment at the hands of Ms. Eckert and the subsequent discharge from Plaintiff's position as a Loan Processor.

65. As a direct and proximate cause of the aforementioned conduct, Plaintiff suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

66. As set forth hereinabove, the Defendant's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

WHEREFORE, Plaintiff Colleen Stratton hereby requests this Honorable Court consider the above and grant relief in his favor. Specifically, Plaintiff Colleen Stratton requests this Court award her back pay, front pay, any other compensatory and punitive damages as calculated by the Court, pre-judgment and continuing interest as calculated by the Court, costs, and reasonable attorney's fees.

## COUNT II
## FAILURE TO ACCOMMODATE IN
## VIOLATION OF THE ADA AND THE PHRA

67. Plaintiff incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

68. To prevail on a claim of failure to accommodate, Plaintiff must establish that "(1) the employer knew about the disability; (2) he requested accommodations or assistance for his disability; (3) the employer did not make a good faith effort to assist him in seeking accommodations; and (4) he could have been reasonably accommodated but for the employer's lack of good faith." *Tourtellotte v. Eli Lily & Co.*, 636 F.App'x 831, 849 (3d Cir. 2016) (internal citations omitted); *See also Sharbaugh v. West Haven Manor, LP,* 2016 U.S. Dist. LEXIS 161264 *29 (W.D. Pa. 2016).

69. In the case at hand, Plaintiff is disabled within the meaning of the ADA.

70. Plaintiff was qualified to successfully perform the necessary functions of her job.

71. Plaintiff informed Defendant of her disabilities.

72. On or about March 2020, Plaintiff requested she be permitted to work in the office part time or have her sit/stand desk transported to her in order to mitigate the symptoms of her sciatica.

73. This request was denied by Defendant who further refused to provide Plaintiff a sit/stand desk at home despite Plaintiff's sciatica.

74. On or about April 2020, Plaintiff again requested she be permitted to work in office part time because the office is a quieter and more stable environment, there are other loan processors in the office she could readily ask questions to, and Plaintiff had access to her sit/stand desk which Plaintiff needed for her sciatica.

75. Plaintiff's request to work in-office was denied because she "was not an essential worker." However, another loan processor from Plaintiff's team was able to work part-time in office.

76. Mc. Eckert refused to accommodate Plaintiff's request to work in the office with access to her sit/stand desk and Mc. Eckert refused to provide Plaintiff one at her home workplace.

77. Plaintiff could have been readily and reasonably accommodated by Defendant, however Defendant failed to provide even a modicum of good faith or a willingness to engage in the accommodations process.

78. As a direct and proximate cause of the aforementioned conduct, Plaintiff suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

79. As set forth hereinabove, the Defendant's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in his favor. Specifically, Plaintiff requests this Court award her back pay, front pay, any other compensatory and punitive damages as calculated by the Court, pre-judgment and continuing interest as calculated by the Court, costs, and reasonable attorney's fees.

### COUNT III
### HOSTILE WORK ENVIORNMENT IN
### VIOLATION OF THE ADA AND THE PHRA

80. Plaintiff incorporates the allegations set forth in the paragraphs, above, as if fully set forth at length herein.

81. To prove a hostile work environment claim under the ADA, an employee must show, inter alia, that her workplace was permeated with discriminatory intimidation, ridicule, and insult, sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. Americans with Disabilities Act of 1990 § 102 *Hair v. Fayette County of Pennsylvania*, 265 F. Supp. 3d 544 (W.D. Pa. 2017).

82. The United States Supreme Court "has held that when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII . . . is violated." *Washington v. Martinez*, 2004 U.S. Dist. LEXIS 4325 at *16 - *17 (E.D. Pa. 2004).

83. Courts have held that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all of the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Washington* at *17 - *18 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 22 (1993)).

84. Throughout the course of her employment, Plaintiff endured a hostile environment on the basis of her disabilities.

85. Despite the knowledge of Plaintiff's disabilities, Defendant consistently refused to accommodate Plaintiff.

86. Due to Defendant's refusal to accommodate Plaintiff, Plaintiff suffered exacerbation of her disability symptoms.

87. Furthermore, Ms. Eckert constantly berated and harassed Plaintiff on the basis of her disabilities.

88. Upon information and belief, Ms. Eckert did not berate and harass Plaintiff's similarly situated coworkers in the same way.

89. As set forth hereinabove, the Defendant's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in him favor. Specifically, Plaintiff requests this Court award him back pay, front pay, any other compensatory and punitive damages as calculated by the Court, pre-judgment and continuing interest as calculated by the Court, costs, and reasonable attorney's fees.

## COUNT IV
## RETALIATION IN VIOLATION
## OF THE ADA AND THE PHRA

90. The ADA prohibits employers from retaliating against employees. 42 U.S.C. § 12203(a). To establish a claim for retaliation, Plaintiff must prove: (1) a protected employee activity; (2) an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d

751, 759 (3d Cir. 2004); *Lackey v. Heart of Lancaster Regl. Med. Ctr.*, 704 Fed. Appx. 41, 49–50 (3d Cir. 2017).

91. Plaintiff sought to have her disabilities accommodated by her employer as described hereinabove.

92. Plaintiff explicitly requested reasonable accommodations and therefore engaged in a protected activity.

93. Following her requests to receive reasonable accommodation, Defendant outwardly refused to provide any sort of accommodations to Plaintiff.

94. Instead, Defendant terminated Plaintiff on or about July 29, 2020.

95. Defendant's actions, when viewed in their entirety, can only be viewed as retaliatory against Plaintiff for the invocation of her rights to reasonable accommodation under the ADA and the PHRA.

96. As a direct and proximate cause of the aforementioned conduct, Plaintiff suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

97. As set forth hereinabove, the Defendant's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in her favor. Specifically, Plaintiff requests this Court award her back pay, front pay, any other compensatory and punitive damages as calculated by the Court, pre-judgment, and continuing interest as calculated by the Court, costs, and reasonable attorney's fees.

## COUNT V
## FMLA INTERFERENCE

98. Plaintiff incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

99. The FMLA provides in pertinent part, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" these rights, violation of which is known as FMLA retaliation. *Lichtenstein v. U. of Pittsburgh Med. Ctr.*, 691 F.3d 294, at 307 (3d Cir. 2012) (citing to 29 U.S.C. § 2615(a)(1)).

100. In order to demonstrate a claim for FMLA interference, a Plaintiff must establish: "(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA." *Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014) (citing to *Johnson v. Cmty. Coll. of Allegheny Cnty.*, 566 F.Supp.2d 405, 446 (W.D. Pa. 2008); see also, *Sommer v. The Vanguard Grp.*, 461 F.3d 397, 399 (3d Cir. 2006)).

101. Moreover, an employee does not need to prove that invoking FMLA rights was the sole or most important factor upon which the employer acted." *Lichtenstein v. U. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301 (3rd Cir. 2012).

102. Under this regulatory interpretation, employers are barred from considering an employee's FMLA leave "as a negative factor in employment actions such as hiring, promotions, or disciplinary actions." *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005).

103. Plaintiff was employed for a qualified employer under the FMLA and was therefore entitled to leave pursuant to the FMLA.

104. Plaintiff acknowledged and exercised her FMLA rights when she Defendant with the appropriate FMLA paperwork pursuant to her pregnancy.

105. Although not a formalistic standard to invoke rights under the FMLA, employees must give their employer "adequate notice", and in doing so the employee "need not expressly assert rights under the FMLA, or even mention the FMLA." *Lichtenstein v. U. of Pittsburgh Med. Ctr.*, 691 F.3d 294, at 303 (3d Cir. 2012) (interpreting the language of 29 U.S.C. § 2612(e)(2) and 29 C.F.R. § 825.303(b)).

106. Ms. Eckert constantly question's Plaintiff's use of FMLA leave.

107. On or about July 2020, Plaintiff requested to utilize FMLA time, but Ms. Eckert told Plaintiff her FMLA ran out June 1, 2020.

108. Plaintiff consulted her physician, who has a record of Plaintiff's FMLA time, and discovered this was not the case.

109. As a result, Plaintiff was unable to utilize her FMLA leave.

110. On or about July 29, 2020, Plaintiff was informed of her termination of employment.

111. Plaintiff's termination was the ultimate result of the invocation of her FMLA rights on or about July of 2020.

112. Between the invocation of FMLA rights, the denial of Plaintiff's FMLA leave, and the adverse employment decision, Plaintiff's employer actively interfered with her right to take FMLA leave in direct violation of 29 U.S.C. § 2615(a)(1).

113. Defendant violated Plaintiff's rights by interfering with and/or restraining the exercise of Plaintiff's FMLA leave in direct violation of 29 U.S.C. § 2615(a)(1).

WHEREFORE, Plaintiff, respectfully requests this Honorable Court enter judgment in her favor and against Defendant, and enter any and all wages due to Plaintiff, in excess of arbitration limits, as well as reasonable costs and attorney's fees and liquidated damages pursuant to the Family and Medical Leave Act of 1993 29 U.S.C. § 2601 *et seq.*

## COUNT VI
### RETALIATION IN VIOLATION OF THE FMLA

114. Plaintiff incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

115. In order to prevail on a claim of retaliation under the FMLA, one must prove that: (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights. *Lichtenstein v. U. of Pittsburgh Med. Ctr.,* 691 F.3d 294, 302 (3d Cir. 2012).

116. Plaintiff invoked her right to FMLA qualifying leave when she requested to utilize FMLA time on or about July of 2020.

117. Plaintiff is an eligible employee under 29 U.S.C.A §2611(2) who invoked her right to FMLA-qualifying leave for her diabilities which affected her ability to perform the functions of her position.

118. Plaintiffs need only to show evidence that creates an inference that a causative link exists between the FMLA leave and termination. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279-81 (3d Cir. 2000); see also, 29 U.S.C.A. § 2615(a)(2).

119. "When the temporal proximity between the protected activity and adverse action is unduly suggestive, this is sufficient standing alone to create an inference of causality…" *Lichtenstein v. U. of Pittsburgh Med. Ctr.*, 691 F.3d 294, at 307 (3d Cir. 2012) (citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n,* 503 F.3d 217, 232 (3d Cir. 2007)).

17

120. Ms. Eckert constantly questioned Plaintiff when she invoked her right to FMLA leave.

121. A large portion of Plaintiff's workplace conflicts directly resulted from utilizing her FMLA qualifying leave.

122. The combination of Ms. Eckert's history with Plaintiff and the circumstances surrounding Plaintiff's termination effectuate the inference that her termination was a direct result of said utilization.

123. Plaintiff was terminated on or about July 29, 2020, almost immediately following her request for FMLA leave.

124. Due to the temporal proximity of the actions taken by her superiors and Human Resources, there is more than an inference, and in fact a direct causal relationship between the termination of Plaintiff's employment and the invocation of her FMLA rights.

125. As a direct and proximate result of the aforementioned conduct, Plaintiff suffered actual damages, including, but not limited to, lost wages, emotional distress all in the past present and future.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in her favor. Specifically, Plaintiff requests this Court award her back pay, front pay, any other compensatory and punitive damages as calculated by the Court, pre-judgment and continuing interest as calculated by the Court, costs, and reasonable attorney's fees.

**JURY TRIAL DEMANDED UPON APPEAL OR REMOVAL.**

                                                Respectfully submitted,

                                                **J.P. WARD & ASSOCIATES, LLC**

Date: October 25, 2021                      By: _____
                                                Joshua P. Ward (Pa. I.D. No. 320347)
                                                Kyle H. Steenland (Pa. I.D. No. 327786)

                                                J.P. Ward & Associates, LLC
                                                The Rubicon Building
                                                201 South Highland Avenue
                                                Suite 201
                                                Pittsburgh, PA 15206

                                                Counsel for Plaintiff